IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELODY COOPER, Individually and :
as Personal Representative of
The Estate of Kwamena Ocran      :

    v.                           :   Civil Action No. DKC 22-0052

                               :

OFFICER JAMES DOYLE, et al.      :

                               :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights action brought by Melody Cooper ("Plaintiff"), the mother and personal representative of the Estate of Kwamena Ocran ("Mr. Ocran"), are:  (1) the motion for summary judgment filed by Defendants James Doyle ("Officer Doyle"), Willie Delgado ("Sgt. Delgado"), Kyle Khuen ("Officer Khuen"), and Larbi Dakkouni ("Cpl. Dakkouni") (collectively, "Defendant Officers") and City of Gaithersburg ("the City") (collectively with Defendant Officers, "Defendants"), (ECF No. 44); (2) Defendants' motion for leave to file video recordings as exhibits, (ECF No. 46); and (3) Plaintiff's motion for leave to file an audio recording as an exhibit, (ECF No. 52).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Defendants' motion for summary judgment will be granted in part and denied in part, Defendants' motion for leave to file video recordings as exhibits will be granted, and

Plaintiff's motion for leave to file an audio recording as an exhibit will be granted.

## I.   Background[1]

### A. Factual Background

### 1. Investigation of Mr. Ocran

In January 2021, Defendant Officers were members of the Street Crimes Unit ("SCU") of the City of Gaithersburg Police Department ("GPD").   (ECF Nos. 44-4, at 7; 44-5, at 10; 44-6, at 6; 44-7, at 8).   The SCU is a plainclothes unit that conducts investigations in areas including firearms, narcotics, case enhancement, and fugitive operations.   (ECF No. 44-4, at 7).   In 2016 or 2017, Cpl. Dakkouni had participated in an investigation of the decedent, Mr. Ocran, that he understood had resulted in Mr. Ocran's arrest.   ECF No. 44-6, at 8-10).

Cpl. Dakkouni began working with a confidential informant ("CI") in 2017 or 2018.   (ECF No. 44-6, at 7; *see also* ECF No. 44-5, at 14).   In December 2020, the CI contacted Cpl. Dakkouni with information regarding Mr. Ocran.   (ECF No. 44-6, at 10).   The CI provided information indicating that Mr. Ocran had been released from prison, was in possession of a weapon, and was "looking to make a move."   (*Id.*).   After the SCU verified that Mr. Ocran was

---

[1]   Unless otherwise noted, the facts outlined here are undisputed.

a "prohibited possessor" of a handgun and that he had just been released from incarceration, it began investigating him. (*Id.*).

Beginning in December of 2020, the SCU made several unsuccessful attempts to locate Mr. Ocran. (*Id.* at 10-11). The CI indicated that Mr. Ocran stayed with his girlfriend at the Chelsea Park Apartments at 14 South Frederick Avenue in Gaithersburg, but his residence was in the Silver Spring area. (*Id.* at 11, 20).

Also in December 2020, Cpl. Dakkouni asked the CI whether the CI could get Mr. Ocran to leave the apartment, and the CI responded affirmatively. (ECF Nos. 44-6, at 20; 44-8, at 2). Cpl. Dakkouni asked whether Mr. Ocran "sell[s,]" and the CI replied, "[n]uh he a jack boy" with a "[g]un on him every[]where he go," and is a "[l]oose cannon." (ECF No. 44-8, at 2). In the same conversation, the CI texted Cpl. Dakkouni that Mr. Ocran "said he not going back to jail he will shoot it out[.]" (ECF Nos. 44-6, at 10, 11; 44-8, at 3). The CI also relayed that Mr. Ocran's "stick" had an "extension on it" which "[h]olds hella shells[.]" (ECF No. 44-8, at 3). Cpl. Dakkouni asked the CI if he had any other pictures of Mr. Ocran. (ECF No. 44-6, at 21). The CI responded with a picture of a person's hand grasping a handgun and the message "[t]hat's it" as well as a copy of a social media page with a photo of Mr. Ocran. (ECF Nos. 44-6, at 21; 44-8, at 4-5). During the text exchange, Cpl. Dakkouni asked the CI if Mr. Ocran is a "shooter"

to which the CI responded, "[h]e claims[.]" (ECF Nos. 44-6, at 21; 44-8, at 5).

In December 2020, Cpl. Dakkouni told Officers Khuen and Doyle that Mr. Ocran was carrying firearms, that he was a prohibited possessor, and that the information had come from a credible source. (ECF Nos. 44-4, at 10-11; 44-7, at 8). Officer Khuen participated in the initial investigation by monitoring Mr. Ocran's social media. (ECF No. 44-4, at 11).

On January 8, 2021, the CI informed Cpl. Dakkouni that Mr. Ocran was in possession of a handgun and was going to attempt to sell it in the parking lot of the Chelsea Park Apartments. (ECF No. 44-6, at 13, 16). The CI reported that it[2] (the CI) was meeting Mr. Ocran at Mr. Ocran's request because Mr. Ocran wanted the CI present when he sold the weapon. (*Id.* at 13). Cpl. Dakkouni then contacted the SCU team to arrive to work early to initiate surveillance on Mr. Ocran. (ECF Nos. 44-4, at 15; 44-6, at 13). He also notified his supervisor, Sgt. Delgado. (ECF No. 44-5, at 11-13).

Officers Khuen and Doyle responded to Cpl. Dakkouni's request, and they began surveilling the Chelsea Park Apartments around 1:00 PM. (ECF Nos. 44-4, at 15; 44-6, at 13-15; 44-7, at 12). Sgt. Delgado joined the surveillance around 2:30 PM. (ECF

---

[2] Defendants refer to the CI as "it" to avoid identifying the CI. (ECF No. 44-1, at 7 n.2).

No. 44-5, at 14).  Cpl. Dakkouni remained in contact with the CI during their surveillance.  (ECF No. 44-6, at 14).   As a plainclothes unit, the SCU members carried their badges but were not in uniform and they conducted surveillance from covert vehicles.  (ECF Nos. 44-4, at 7, 16; 44-5, at 15, 21; 44-6, at 14-15; 44-7, at 12-13).

The SCU's original plan was to allow the illegal handgun purchase take place under surveillance, follow the buyer to do a stop or a takedown, and then return with an arrest warrant and a search warrant for Mr. Ocran.  (ECF Nos. 44-4, at 15-16; 44-5, at 17; 44-6, at 16-17; 44-7, at 13).  The CI, however, informed Cpl. Dakkouni that the sale was not going to take place, and the SCU decided to surveil Mr. Ocran once he left the apartment with the intent to interdict him in a safe location.  (*Id.*).

Cpl. Dakkouni and the CI continued to exchange text messages throughout the afternoon of January 8, 2021.  (*See* ECF No. 44-6, at 23-29).   They discussed Mr. Ocran's plans and Mr. Ocran's location.  (*Id.*).  The CI denied knowing precisely which apartment Mr. Ocran was in, although it ultimately identified the apartment building and provided directions to the door.  (*Id.* at 23-25).  The CI requested that the police not enter the apartment because Mr. Ocran's girlfriend, with whom the CI represented it had some close relationship, was present.  (*Id.* at 24).   The CI also reported that it and Mr. Ocran were leaving the apartment to go to

a nearby International House of Pancakes ("IHOP").  (*Id.* at 28).
The CI confirmed that Mr. Ocran had the handgun with him.  (ECF
Nos. 44-6, at 28; 44-8, at 6).

The SCU team observed Mr. Ocran and the CI leave the apartment
building and followed them as they walked to the shopping center
containing the IHOP.  (ECF Nos. 44-4, at 15; 44-5, at 18; 44-6, at
29; 44-7, at 13-14).  Officer Khuen observed Mr. Ocran and the CI
part ways shortly after arriving at the shopping center.  (ECF
No. 44-4, at 15).  Around this time, Sgt. Delgado could no longer
see Mr. Orcan and asked the SCU team members if he was displaying
any mannerisms consistent with someone carrying a handgun.  (ECF
No. 44-5, at 18-19).  They responded in the affirmative, noting
that he was guarding his waistband, placing his hand in his
waistband, and looking around.  (*Id.*).  After Mr. Ocran and the CI
parted ways, the SCU team followed Mr. Ocran back towards the
Chelsea Park Apartments.  (ECF No. 44-6, at 29).  The SCU decided
to stop Mr. Ocran before he reached the apartments.  (ECF Nos. 44-
6, at 29; 44-7, at 14).  According to Sgt. Dakkouni, Mr. Ocran's
movements as he returned to the apartments were consistent with
someone holding a gun in his waistband.  (ECF No. 44-6, at 30).
The SCU members all returned to the parking lot area.  (ECF
Nos. 44-6, at 30; 44-7, at 14).  It had become dark outside,
although the parking area was illuminated by streetlights and
lights from the buildings.  (ECF Nos. 44-6, at 30; 44-7, at 14).

**2. The Events Leading to Mr. Ocran's Death**

**a. Officer Khuen's Version**

When Mr. Ocran entered the parking lot area, he walked past Officer Khuen. (ECF No. 44-4, at 16). Officer Khuen then displayed his police badge, shined his flashlight on Mr. Ocran, and stated, "[P]olice, I need to talk to you." (ECF Nos. 44-4, at 16). Mr. Ocran said, "oh fuck," grabbed his waistband, and began to run. (*Id.*). Officer Khuen gave chase. (*Id.*). Officer Khuen described what happened next:

> Q. And how far away from Ocran were you at the time that you started chasing him?
> A. I want to say four or five feet.
> Q. And what do you recall observing at that time?
> A. As I was chasing him through . . . the grass median in the parking lot right in front of where my car was parked, Corporal Dakkouni was running around the other side of the parking lot to try to cut him off. We're yelling police, stop running . . . I heard Corporal Dakkouni say don't grab for the gun, don't grab for the gun. Police, stop running. And at that point I could see Ocran turned with his body like this, extending his arm out towards us and I just see a muzzle flash.
> Q. And when you saw the muzzle flash, were you able to -- did you hear anything at that time?
> A. No, sir.
> Q. And how far away were you from Mr. Ocran at that time?
> A. I believe it was like five feet, something like that.
> Q. Where was Corporal Dakkouni at that time, at the time that you say you saw this muzzle flash?

7

A. He was slightly in front of me.  To my
recollection he was right in front of me to
the left.
Q. Okay.  Was he closer to Mr. Ocran than you?
A. Yes, sir, he was.
Q. And was Mr. Ocran running away from you at
that time?
A. Yes, sir.
. . . .
Q. Okay.  When you saw this muzzle flash, what
did you do?
A. I took my radio and threw it into my left
hand, drew my firearm and started firing at
Mr. Ocran.
Q. How many times did you fire?
A. I believe it was six.

(*Id.* at 17).

### b. Sgt. Delgado's Version

Officer Khuen passed Mr. Ocran before turning around, identifying himself as police, and asking Mr. Ocran if they could talk.  (ECF No. 44-5, at 20).  From approximately fifteen yards away, Sgt. Delgado observed that Officer Khuen was wearing a badge around his neck and holding a flashlight.  (*Id.* at 21).  Mr. Ocran said, "[o]h, shit" and began running away.  (*Id.*).  Sgt. Delgado then started chasing him and caught up with Cpl. Dakkouni and Officer Khuen, who were in front of Sgt. Delgado to his left, and Officer Doyle, who was to his right.  (*Id.*).

Mr. Ocran and the officers made a right turn between the Jersey wall and the apartment building.  (*Id.* at 22). During that time, Mr. Ocran looked to his right and left, and, based on the height of Mr. Ocran's right elbow as he ran, Sgt. Delgado inferred

that he was reaching into his waistband. (*Id.*). Sgt. Delgado was about twelve to fifteen feet behind Mr. Ocran. (*Id.*). Cpl. Dakkouni yelled, "Don't do it. Don't do it. No, no, no." (*Id.*). Sgt. Delgado recalled:

> A. I saw a muzzle flash from the center of all officers.
> Q. So were you and Corporal Dakkouni and Officer Doyle and Officer Khuen running in a straight line, or were you all kind of spread out?
> A. We were spread out.
> Q. And this muzzle flash you say you're certain came from Mr. Ocran; is that right?
> A. It was in the middle, yes.
> Q. When you say it was in the middle, what does that mean?
> A. Mr. Ocran was in the middle. I said Corporal Dakkouni and Officer Khuen were to my left, James was to my right. Directly in front of me was Mr. Ocran.
> Q. Okay.
> A. The muzzle flash came from the middle.
> . . . .
> Q. Did you hear a gun fire at the time that you say that you saw this muzzle flash?
> A. No.
> Q. And you -- at that point in time, when you say you saw this muzzle flash, would you say you were that same about 12 feet away from him?
> A. Approximately, yes.
> Q. And so what did you do after that?
> A. I drew my firearm.
> Q. What did you do after that?
> A. Fired.
> Q. Okay.  What were you firing at?
> A. Mr. Ocran.
> Q: Okay.  Were you the first officer to fire at Mr. Ocran?
> A. No.
> Q. How long after you saw the muzzle flash was it that you began to fire?
> A. Almost immediately.

> Q. . . . Did you see any other members of your
> team draw their weapons and fire before you?
> A. I heard gunfire before me, but I didn't see
> them draw, aim.  I heard gunfire.

(*Id.* at 22-23).

As Sgt. Delgado fired two shots, Mr. Ocran was standing with his body angled towards the officers with his right hand stretching out.  (*Id.* at 23).  Mr. Ocran was pointing the firearm in the direction of Officer Doyle.  (*Id.*).  Sgt. Delgado fired his weapon because he was in fear of imminent bodily harm to himself or other members of the SCU team.  (*Id.* at 25).

### c. Cpl. Dakkouni's Version

When Officer Khuen confronted Mr. Ocran, Mr. Ocran had one hand in his waistband.  (ECF No. 44-6, at 30).  Mr. Ocran said, "[o]h, shit" and started to run away.  (*Id.*).  Cpl. Dakkouni jogged to get closer as Officer Khuen made his approach, and then beelined toward Mr. Ocran once Mr. Ocran began to flee.  (*Id.*).

Officer Khuen was closest to Mr. Ocran when the foot chase began, while Cpl. Dakkouni was about fifteen feet from Mr. Ocran. (*Id.* at 30-31).  Cpl. Dakkouni passed Officer Khuen, came up directly behind Mr. Ocran, and screamed, "Police.  Police.  Let me see your hands.  Stop reaching in your waistband[,]" and "Police. Stop running.  Stop reaching.  Don't do it, don't do it[.]"  (*Id.* at 31).  Mr. Ocran continued to run with both hands near his waistband and he looked backward to his right twice, toward Cpl.

Dakkouni.  (*Id.*).  Cpl. Dakkouni did not see whether Mr. Ocran was holding a handgun, but he believed that Mr. Ocran was armed based on the CI's information, Mr. Ocran's mannerisms, and his experience and training as a police officer.  (*Id.*).

During the foot pursuit, Cpl. Dakkouni changed his position in relation to Mr. Ocran, a maneuver described as "getting off the X."  (*Id.*).  When Mr. Ocran looked back a third time, Cpl. Dakkouni saw a muzzle flash.  (*Id.*).  Cpl. Dakkouni did not hear anything at the time he saw the muzzle flash.  (*Id.* at 32).  None of the officers were struck by a bullet.  (*Id.*).  After he saw the muzzle flash, he fired at Mr. Ocran from approximately seven feet away.  (*Id.*).

### d. Officer Doyle's Version

As Officer Khuen contacted Mr. Ocran, Mr. Ocran dug his right arm deeper into his coat pocket area, held down on his jacket pocket, and started to run away from Officer Khuen through the parking lot.  (ECF No. 44-7, at 14).  Officer Doyle did not see a firearm in Mr. Ocran's possession.  (*Id.*).  Officer Doyle began pursuing Mr. Occran.  (*Id.* at 15).  Officer Doyle was behind Officer Khuen and in front of Sgt. Delgado.  (*Id.*).  The officers said "stop" multiple times.  (*Id.*).  Mr. Ocran turned the corner and looked back towards the officers three times.  (*Id.*).  Mr. Ocran turned his body and Officer Doyle saw a firearm in Mr. Ocran's hand.  (*Id.*).  Officer Doyle then went to grab his weapon,

but his jacket was caught in his holster, so he looked down. (*Id.*).  He heard a shot fired while looking down but did not see a flash.  (*Id.*).  He believed the shot was fired in his direction based on his experience in the military and as a police officer. (*Id.* at 16).  He drew his firearm.  (*Id.*).  He saw Mr. Ocran's hand coming back out, and then fired at Mr. Ocran.  (*Id.*).

### e. Plaintiff's Position

Plaintiff accepts Defendants' version of the facts, with two exceptions.  She asserts that a genuine dispute of material fact exists as to whether:  (1) Mr. Ocran pointed a firearm at Defendant Officers, and (2) Mr. Ocran discharged a firearm at Defendant Officers.  (ECF No. 51-1, at 4-5).

### 3. Video and Audio Recordings of the Incident

Defendants have filed four proposed exhibits of video recordings.  They include parking lot security camera footage, a cell phone video taken from inside the apartment complex, and footage from two body-worn cameras worn by responding officers. The parking lot security camera footage purportedly captures Mr. Ocran running across the parking lot and Defendant Officers chasing him.  No shots are fired during the video, and there is no indication that Mr. Ocran held his hands in his waistband or had a handgun.  The cell phone video purportedly captures Mr. Ocran lying face down in the grass outside the apartment building and four uniformed men circling him while holding flashlights and

pointing firearms at him.  It also shows uniformed officers arriving, one of whom brings what appears to be a ballistic shield near Mr. Ocran.  Another retrieves an item on the ground near Mr. Ocran and moves it several feet away.  As he does so, the person filming the video says, "Mira, la pistola.  Quita la pistola."[3] The two body-worn camera videos purportedly capture Mr. Ocran lying on the ground with officers surrounding him and administering CPR. The second body-worn camera video also shows officers eventually placing a blanket over Mr. Ocran's body.

Plaintiff has filed a proposed exhibit containing an audio recording purportedly containing an interview between Detective Paula Hamill ("Detective Hamill") and a child who says he looked out the window and saw Mr. Ocran lying on the ground with his hands in front of him, still breathing.  He states that while Mr. Ocran was lying on the ground, he saw a police officer in a green hat shoot Mr. Ocran in the back three or four times.  He says that he did not hear any gunshots before seeing the officer shoot Mr. Ocran on the ground.

**4. Post-Incident Investigation**

The Montgomery County Police Department ("MCPD") commenced an investigation supervised by the Howard County State's Attorney's Office.  (*See* ECF No. 44-3).

---

[3] This roughly translates to "Look, the gun.  He takes the gun away."

As part of the investigation, the SCU members involved in the incident were interviewed and video and forensic evidence from the scene was reviewed. (*See* ECF No. 44-3). The investigation determined that police fired twenty-seven rounds, twenty-three shell casings of which were collected at the scene. (ECF No. 44-3, at 6) (finding that Sgt. Delgado fired one round, Officer Khuen fired six rounds, Officer Doyle fired eight rounds, and Cpl. Dakkouni fired twelve rounds). A Hi-point 9mm handgun with one round in the chamber and three additional rounds in the magazine was recovered from the area near Mr. Ocran's right hand. (ECF Nos. 44-3, at 6; 44-14, at 3). No shell casings or projectiles were recovered from the Hi-point 9mm handgun. (ECF Nos. 44-3, at 6; 51-3). There were no non-law enforcement witnesses to the shooting, although there were witnesses to hearing the shots, hearing someone yelling, and seeing the police officers pursuing Mr. Ocran. (ECF No. 44-3, at 6).

In addition to a firearms examination, Mr. Ocran's winter coat was tested for gunshot residue, as were the plastic bags used to cover his hands during the autopsy investigation. (ECF No. 44-15). Particles characteristic of gunshot residue were found on the right cuff/sleeve of the coat. (*Id.* at 3). One particle characteristic of gunshot residue was found on the bag covering Mr. Ocran's left hand and no gunshot residue particles were found on the bag covering Mr. Ocran's right hand. (*Id.* at 8).

14

The firearm recovered next to Mr. Ocran's body was also tested for DNA.  (ECF No. 44-13).  According to the Forensic Biology Report, there is "very strong support for Kwamena Ocran to be included as a contributor to the mixed DNA profile obtained from" the grip and slide of the firearm.  (*Id.* at 3).  The Autopsy Report determined that Mr. Ocran's cause of death was multiple gunshot wounds.  (ECF No. 51-4, at 6-8, 11-12) (finding eight gunshot wounds in total, seven with a wound path of back to front and one with an indeterminate wound path).

The investigation was submitted to a Montgomery County Grand Jury for consideration of charges.  (ECF No. 44-16).  On October 7, 2021, the Grand Jury declined to issue any charges against the officers.  (*Id.*).

Plaintiff retained Tyrone Powers, Ph.D., to provide an analysis and assessment of liability.  (ECF No. 51-6).  Dr. Powers concluded that "it was not objectionably [sic, objectively] reasonable and [was] inconsistent with accepted standards of police practices, polices and training for Cpl. Dakkouni and members of the Gaithersburg City Police Street Crimes Unit (SCU) to shoot Kwamena Ocran."  (ECF No. 51-6, at 33).  Dr. Powers also opined that "[t]he use of force used against Kwamena Ocran was excessive and unjustified; it[] was not objectively reasonable, was unreasonable, disproportional, and unnecessary."  (*Id.*).

### 5.   Post-Incident SCU Communications

Within the week after January 8, 2021—before speaking to the detectives investigating Mr. Ocran's death—Officer Khuen, Officer Doyle, Cpl. Dakkouni, and their families met at Sgt. Delgado's home to bring their "families together so that [they] were in this together and ma[k]e sure that everybody was okay." (ECF No. 44-7, at 10; *see also* ECF Nos. 44-4, at 9-10; 44-5, at 23-24; 44-6, at 34; 44-7, at 11). The officers met at one of their homes on at least two occasions. (ECF Nos. 44-4, at 9; 44-5, at 23; 44-6, at 34). According to Officer Khuen, the officers did not talk about the shooting, but rather "just check[ed] on each other to make sure each other was okay." (ECF No. 44-4, at 10). According to Sgt. Delgado, the officers "talked about how tragic [the shooting] was." (ECF No. 44-5, at 24). According to Cpl. Dakkouni, the officers did not talk about the case. (ECF No. 44-6, at 34). According to Officer Doyle, the officers did not discuss the case "except for saying that it was a tragic event and making sure that everybody was okay." (ECF No. 44-7, at 11).

Officer Khuen called Sgt. Delgado and Cpl. Dakkouni shortly after their depositions to ask them how they were doing. (ECF No. 44-4, at 17-18). Officer Doyle also called Sgt. Delgado shortly after his deposition to "make sure that he was good after giving his account at the deposition[.]" (ECF No. 44-7, at 17).

**B. Procedural Background**

On January 8, 2022, Plaintiff, Mr. Ocran's mother, next of kin, and the representative of his estate, filed the instant lawsuit against Officer Doyle, Officer Khuen, Sgt. Delgado, Cpl. Dakkouni, and unknown officers[4]; Montgomery County, Maryland; the GPD; and the City. (ECF No. 1). Plaintiff voluntarily dismissed Montgomery County from the lawsuit. (ECF No. 12). The complaint asserts six claims:

1) 42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment (Against the Defendant Officers)
2) Wrongful Death – Negligence; Negligence Per Se; Gross Negligence; Negligent Training, Supervision, and Retention (Against all Defendants)
3) Survival Action (Md. Cts. & Jud. Pro. Code 6-401) – Negligence; Negligence Per Se; Gross Negligence; Negligent Training, Supervision, and Retention; Assault (Against all Defendants)
4) Assault/Battery (Against the Defendant Officers)
5) Respondeat Superior (Against the Gaithersburg Police Department and the City of Gaithersburg)
6) Maryland Declaration of Rights Article 24: Deprivation of Liberty and Property, Excessive Force, and Homicide (Against the Defendant Officers and the City of Gaithersburg)

(ECF No. 1).

On March 14, 2022, Officer Doyle filed a motion to dismiss Counts Two and Three for failure to state a claim upon which relief

---

[4] No unknown officers have been added by way of amendment.

can be granted.  (ECF No. 18).  On March 15, 2022, the City filed a motion to dismiss the complaint or, in the alternative, to bifurcate and stay discovery.  (ECF No. 20).  The court denied Officer Doyle's motion and granted in part and denied in part the City's motion.  (ECF Nos. 30; 31).  The court dismissed all claims against GPD, Count Five in its entirety, and all claims against the City in Counts One, Two, and Three.  (*Id.*).  As a result, Counts One, Two, Three, Four, and Six are pending against Defendant Officers.  Count Six, under a theory of vicarious liability for Defendant Officers' conduct, is the only surviving claim against the City.

On October 13, 2023, Defendants filed a motion for summary judgment, (ECF No. 44), and a motion for leave to file video recordings as exhibits, (ECF No. 46).  On November 20, 2023, Plaintiff filed an opposition to the motion for summary judgment, (ECF No. 51), and a motion for leave to file an audio recording as an exhibit, (ECF No. 52).  Defendants replied on December 8, 2023.  (ECF No. 53).  Neither party filed an opposition to the other party's motion for leave to file video or audio recordings as exhibits.

## II.  **Standard of Review**

Parties "may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Fed.R.Civ.P. 56(b).  A court may grant summary judgment if there

is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  The court must "view the evidence in the light most favorable to . . . the nonmovant[.]" *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "[T]he nonmoving party nonetheless must offer some 'concrete evidence from which a reasonable juror could return a verdict in his [or her] favor.'"  *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)).

**III. Analysis**

    **A. Motions for Leave to File Video and Audio Recordings as Exhibits**

Defendants move for leave to file video recordings as exhibits, (ECF No. 46), and Plaintiff moves for leave to file an audio recording as an exhibit, (ECF No. 52).  Good cause exists to permit the filings and both unopposed motions will be granted. *See, e.g.*, *Borkowski v. Baltimore Cnty., Maryland*, 583 F.Supp.3d 687, 694 (D.Md. 2021) ("Defendants' unopposed motion for leave to file audio and video exhibits will be granted."); *Mayhall v. MRS BPO, LLC*, No. 19-cv-2384-GJH, 2021 WL 795160, at *1 n.1 (D.Md. Mar. 1, 2021) ("Because good cause supports including the audio recording in its filing, Defendant's Motion is granted.").

**B. Motion for Summary Judgment**

Defendants assert that they are entitled to summary judgment on all remaining claims because "the use of force by the Officers was objectively reasonable as a matter of law, justified and, in fact, necessary for their own protection[.]"  (ECF No. 44-1, at 17).

**1. Count One: Section 1983 Excessive Force**

In Count One, Plaintiff brings a § 1983 claim alleging that Defendant Officers unreasonably seized Mr. Ocran through excessive force in violation of his Fourth Amendment rights.  (ECF No. 1 ¶¶ 47-69).

**a. Violation of Mr. Ocran's Constitutional Rights**

An action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief[.]" *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  The Fourth Amendment protects the "right to be free from unreasonable searches and seizures, which encompasses the right to be free of arrests, investigatory stops, or other seizures effectuated by excessive force." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

Excessive force claims are evaluated under "a standard of 'objective reasonableness.'" *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) (quoting *Graham*, 490 U.S. at 399).  "When *deadly*

force is used, . . . [the court must] consider whether the hypothetical reasonable officer in that situation would have had 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others.'" *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) (quoting *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005)). Factors to be considered when applying the objective reasonableness standard are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). The "reasonableness 'determination must focus on the moment that deadly force was used, not the whole episode,' and [the court] must be mindful that 'the justification for deadly force can fall away in seconds.'" *Aleman v. City of Charlotte*, 80 F.4th 264, 285 (4th Cir. 2023), *cert. denied*, 144 S.Ct. 1032, 218 L.Ed.2d 187 (2024)) (quoting *Stanton*, 25 F.4th at 233).

The United States Court of Appeals for the Fourth Circuit has explained:

> With deadly force cases, special difficulties can arise during summary judgment. Often, the officer has killed the only other potential witness. Courts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence. *See*

> *Ingle ex rel. Est. of Ingle v. Yelton*, 439
> F.3d 191, 195 (4th Cir. 2006); *see also Brown
> ex rel. Lawhorn v. Elliott*, 876 F.3d 637, 641
> (4th Cir. 2017) (emphasizing "the importance
> of drawing inferences in favor of the
> nonmovant, even when . . . a court decides
> only the clearly-established prong" (quoting
> *Tolan v. Cotton*, 572 U.S. 650, 134 S.Ct. 1861,
> 1866, 188 L.Ed.2d 895 (2014))).  Speculation
> alone cannot create a factual dispute. *Elliott*
> [*v. Leavitt*], 99 F.3d [640,] 644-45 [(4th Cir.
> 1996)] (requiring "specific, material factual
> contentions").  But in these cases, it would
> be easy to overvalue the narrative testimony
> of an officer and to undervalue potentially
> contradictory physical evidence.  *See, e.g.,
> Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.
> 1994) ("[T]he judge must ensure that the
> officer is not taking advantage of the fact
> that the witness most likely to contradict his
> story—the person shot dead—is unable to
> testify.").  So we should be cautious to avoid
> simply accepting officer testimony as true.
> *See Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir.
> 1999).  But neither does caution lead us to be
> especially critical of officer testimony in
> these cases.  We need only apply our normal
> summary-judgment rules, which ask whether
> reasonable juries might disagree over some
> material factual dispute.  *See Harris* [*v.
> Pittman*], 927 F.3d [266,] 276 [(4th Cir. 2019)]
> (suggesting that exculpatory officer
> statements "do not justify a departure from
> the normal summary judgment standard"); *Plakas
> v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

*Stanton*, 25 F.4th at 234; *see also Knibbs v. Momphard*, 30 F.4th

200, 216 (4th Cir.), *cert. denied*, 143 S.Ct. 303, 214 L.Ed. 2d 133

(2022) (noting that the court will not accept the officer's "self-

serving statements" where he "'has killed the only other potential

witness' that can directly refute his account of what happened"

(quoting *Stanton*, 25 F.4th at 234)).

Defendants contend that Defendant Officers' "use of force was objectively reasonable given that the officers were confronted with the imminent threat of death or serious bodily injury." (ECF No. 44-1, at 17). Specifically, they assert that the use of deadly force was justified because Mr. Ocran fled, ignored instructions not to pull his weapon from his waistband, and pointed a gun in the direction of Defendant Officers. (*Id.* at 20).

Plaintiff responds that Defendant Officers' use of force was not objectively reasonable because:  (1) "based on review of the parking lot video, it does not appear that [Mr. Ocran] had a firearm in his hand, nor does it appear that he pointed a firearm at the officers or bladed his body when pointing the firearm[;]" (2) "[w]hile there were at least twenty-three (23) cartridge casings found on the scene of the shooting, none of those casings belonged to the firearm believed to be in the possession of Mr. Kwamena Ocran[,]" which "raises the question as to whether Mr. Kwamena Ocran ever fired a gun during the incident[;]" (3) "Mr. Kwamena Ocran was struck multiple times in the back which is more consistent with an individual running away than someone turning, pointing and firing a gun[;]" and (4) "a witness described Mr. Kwamena Ocran being shot three or four times as he lay on the ground face down." (ECF No. 51-1, at 6).

Defendants reply that:  (1) "the mere fact that the security camera footage shows that Ocran was not blading his body with

weapon in hand while fleeing from the parking lot fails to raise
a genuine dispute of material fact as to Ocran's conduct at the
point in time the Officers used force against him[]" because the
video only captures the part of the chase before Defendant Officers
shot Mr. Ocran; (2) "whether Ocran discharged his weapon is not a
requirement necessary to prove the reasonableness of the Officers'
actions given that they all testified that Ocran pointed his gun
at the Officers[;]" (3) that Mr. Ocran pointed his firearm in the
direction of Officer Doyle is not inconsistent with the facts that
he was running away from Defendant Officers and was shot in the
back; (4) "the unsworn statement offered by a then nine-year old
child . . . cannot be presented in a form that would be admissible
in evidence[,]" the child did not witness the shots that "caused
Ocran to fall to the ground or the other twenty-three (23) or
twenty-four (24) shots fired by the Officers[,]" and "no reasonable
jury could find his testimony reliable and credible[]" because of
inconsistencies in his statement.[5]   (ECF No. 53, at 3-7).

The first *Graham* factor—the severity of the crime at issue—
weighs in Plaintiff's favor.   It is undisputed that Defendant
Officers initially planned to arrest Mr. Ocran for selling a
handgun, but when the CI informed Cpl. Dakkouni that the sale would

---

[5] Whether the child's statement could be presented in a form
that would be admissible at trial need not be resolved at this
time because other evidence is sufficient to demonstrate a material
dispute of fact.

not take place, Defendant Officers adjusted the plan to arrest Mr. Ocran for unlawful possession of a firearm. (ECF Nos. 44-4, at 15-16; 44-5, at 17; 44-6, at 16-17; 44-7, at 13; 51-1, at 4-5). Although the crime at issue involved a firearm, it was nonviolent. The third *Graham* factor—whether Mr. Ocran actively resisted arrest or attempted to evade arrest by flight—weighs in Defendants' favor. It is undisputed that Mr. Ocran fled from Defendant Officers. (ECF Nos. 44-4, at 16; 44-5, at 21; 44-6, at 30; 44-7, at 14; 51-1, at 4-6).

The parties focus their arguments on the second *Graham* factor— whether Mr. Ocran posed an immediate threat to the safety of the officers or others. It is undisputed that Mr. Ocran was armed. (ECF Nos. 51-1, at 4-5). That Mr. Ocran was armed and fled from the officers, however, does not require the conclusion that Mr. Ocran posed an immediate safety threat. "[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). Moreover, "[t]he fact that a suspect flees from law enforcement is not enough to justify the use of deadly force." *Skeen v. Washington Cnty. Sheriff's Off.*, No. 1:20-cv-00017-JPJ, 2022 WL 1299960, at *6 (W.D.Va. Apr. 22, 2022), *aff'd sub nom. Skeen v. Sparks*, No. 22-1569, 2023 WL 4759122 (4th Cir. July 26, 2023) (citing *Garner*, 471 U.S. at 11). Rather, "deadly force may only be used by a police officer when, based on a reasonable assessment,

the officer or another person is *threatened* with the weapon."
*Cooper*, 735 F.3d at 159.

The parties dispute whether Mr. Ocran threatened Defendant
Officers with his firearm by pointing it and shooting.  Officer
Khuen testified in his deposition, "I could see Mr. Ocran turned
with his body like this, extending his arm out towards us and I
just see a muzzle flash[,]" but he did not hear a shot fired.  (ECF
No. 44-4, at 17).  Sgt. Delgado testified that Mr. Ocran pointed
a firearm in Officer Doyle's direction.  (ECF No. 44-5, at 23).
Sgt. Delgado also stated, "Mr. Ocran was reaching into his
waistband.  I can tell this because his right elbow was high as
he's running[]" and "I saw a muzzle flash[,]" which "came from the
middle[,]" where he said Mr. Ocran was.  (ECF No. 44-5, at 22).
Cpl. Dakkouni testified, "I just see a muzzle flash.  I instantly
-- in slow motion, you see the gun[,]" but that he did not hear a
shot.  (ECF No. 44-6, at 31-32).  He added that Mr. Ocran "was
still running, and all you can see is, like, a twist, maybe small
twist as he turns and shoots."  (ECF No. 44-6, at 32).  Officer
Doyle testified that Mr. Ocran "turned his body in this belated
[sic, bladed] motion . . . And that's when I saw the firearm in
his hand."  (ECF No. 44-7, at 15).  He added, "Once I saw the
firearm, I went to go grab my weapon, realizing that my jacket had
been caught in my holster, so I had to look down and at that point
is when I heard the shot being fired[,]" but that he never saw a

flash from the firearm.   (ECF No. 44-7, at 15).   Officer Doyle also stated that "by the time I get my firearm up and out of the holster, his arm is making the same motion again, coming back in the same motion."   (ECF No. 44-7, at 16).   Finally, he testified that the shot "was coming in my direction.   It wasn't like it was coming from behind me."   (ECF No. 44-7, at 16).

Defendants argue that physical evidence suggests that Mr. Ocran held and fired the handgun.   First, the Forensic Biology Report provides that there is "very strong support for Kwamena Ocran to be included as a contributor to the mixed DNA profile obtained from" the grip and slide of the handgun recovered near him.   (ECF No. 44-13, at 3).   Second, the Firearms Examination Unit Examination Report provides that the pistol was "found to be in operable condition."   (ECF No. 44-14, at 3).   Third, the Gunshot Residue Analysis Reports provide that the right cuff/sleeve of Mr. Ocran's jacket "contained particles characteristic of GSR and two component particles[,]" and that Mr. Ocran's right hand bag "contained no particles characteristic of GSR or two component particles[,]" while his left hand bag "contained a particle characteristic of GSR and a two component particle[.]" (ECF No. 44-15, at 3, 8).   The Reports explain that "GSR can be deposited by circumstances such as discharging a firearm, being in the proximity of a discharging firearm or coming into contact with a surface/object that has GSR on it."   (ECF No. 44-15, at 3, 8).

27

Keeping in mind that Defendant Officers killed the only other witness to the foot pursuit—Mr. Ocran—the court will not "simply accept[] officer testimony as true" and will "consider all contradictory evidence." *Stanton*, 25 F.4th at 234. Defendant Officers' testimony that they saw a muzzle flash or heard Mr. Ocran fire a shot is "self-serving." *Id.* None of Defendant Officers testified that they both saw a muzzle flash *and* heard a shot fired by Mr. Ocran. Officer Doyle is the only officer who testified that he heard the shot, while Officer Khuen, Sgt. Delgado, and Cpl. Dakkoumi testified that they saw a muzzle flash but did not hear a shot. That three of the four did not hear the shot is curious given that all testified that they were within fifteen feet of Mr. Ocran when he allegedly fired the shot. (ECF Nos. 44-4, at 17; 44-5, at 22; 44-6, at 32; 44-7, at 15).

Furthermore, a reasonable jury could conclude that Defendant Officers communicated with each other to ensure that their testimony was consistent. Defendant Officers met at their homes before they were interviewed as part of the investigation. (ECF Nos. 44-4, at 9-10; 44-5, at 23-24; 44-6, at 34; 44-7, at 10-11). Officer Khuen called Sgt. Delgado and Cpl. Dakkouni shortly after they were deposed, and Officer Doyle called Sgt. Delgado shortly after he was deposed. (ECF Nos. 44-4, at 17-18; 44-7, at 16-17). Defendant Officers used strikingly similar language in their depositions, including that they saw a "muzzle flash" rather than

28

that they saw Mr. Ocran fire a handgun, (ECF Nos. 44-4, at 17; 44-5, at 22; 44-6, at 31, 32), and that when they gathered with their families, they only discussed the shooting by talking about how "tragic" it was, (ECF Nos. 44-5, at 24; 44-7, at 11).

The video footage neither negates nor supports Defendant Officers' testimony. Footage from the body-worn cameras and cell phone video taken from a resident inside the apartment building only show Mr. Ocran after Defendant Officers shot him, when he was already lying on the ground. The parking lot security camera footage, on the other hand, only captures the events before shots were fired. It does not show that Mr. Ocran pointed a firearm or even possessed a firearm. Nor does it show that Mr. Ocran made any furtive movements.[6]

As Plaintiff points out, none of the bullets or cartridge casings recovered on the scene belonged to Mr. Ocran's firearm. (*Compare* ECF No. 44-14, at 2-3 (referring to the firearm believed

---

[6] The Fourth Circuit has held that when a suspect "made furtive movements toward a perceived firearm while disobeying the officer's command not to do so[, s]uch actions . . . would rightfully cause a reasonable officer to fear that the suspect intended to cause imminent deadly harm." *Knibbs*, 30 F.4th at 220 (first citing *Slattery v. Rizzo*, 939 F.2d 213, 215-16 (4th Cir. 1991); then citing *Anderson v. Russell*, 247 F.3d 125, 128, 131 (4th Cir. 2001)), *cert. denied*, 143 S.Ct. 303, 214 L.Ed.2d 133 (2022). Of course, Mr. Ocran may have reached into his waistband when not captured by the security camera, as Defendant Officers testified, but the court must be careful not to accept such self-serving statements when Defendant Officers killed the only other potential witness.

to be in Mr. Ocran's possession as "F[ire] E[xamination] U[nit] #: 21-0086") *with* ECF No. 51-3, at 2 (referring to firearms recovered on the scene as "FEU #: 21-0050 thru 21-0054")).  Although gunshot residue was found on the right cuff of Mr. Ocran's jacket and his left hand bag, a reasonable jury could conclude that the residue was "deposited" there by "being in the proximity of [Defendant Officers'] discharging firearm[s,]" not Mr. Ocran's alleged discharging firearm.  (ECF No. 44-15, at 3, 8).  After all, Officer Khuen testified that he was only five feet away from Mr. Ocran when he fired at Mr. Ocran.  (ECF No. 44-4, at 17).  It is also noteworthy that gunshot residue was not found on Mr. Ocran's right hand bag, even though it was found on the right cuff of his jacket and the handgun was recovered on the ground near his right hand. (ECF Nos. 44-3, at 6; 44-14, at 3; 44-15, at 3).  Finally, none of Defendant Officers were shot.  (ECF No. 44-6, at 31).  Considering the evidence in the light most favorable to Mr. Ocran, a reasonable jury could conclude that Mr. Ocran never fired a shot.

A reasonable jury could also conclude that Mr. Ocran never pointed a handgun at Defendant Officers.  The Autopsy Report provides that Mr. Ocran suffered three gunshot wounds to the back, two gunshot wounds to the left arm, one through and through gunshot wound to the right thigh, and one through and through gunshot wound to the left thigh, all with a wound path of back to front, as well as one graze gunshot wound of the penis with an indeterminate wound

path. (ECF No. 51-4, at 6-8, 11-12). Courts have denied officers'
motions for summary judgment where the evidence indicated that the
suspect was shot in the back. *See, e.g.*, *Stanton*, 25 F.4th, at
237 ("[T]he totality of the evidence presented here creates a
genuine fact question about whether [the officer's] story [that he
shot Crumbly when Crumbly turned toward him and began to raise his
hands] is true or whether Crumbley was shot while running away.
And if the jury finds that Crumbley was shot in the back while
unarmed and running away, that would violate his clearly
established rights."); *Risher v. Chapman*, No. 2:16-cv-00292-DCN,
2019 WL 926414, at *4 (D.S.C. Feb. 26, 2019) ("Based on Risher's
deposition testimony, a jury could determine that Risher was not
pointing a gun when shots were fired. Based on ambulance reports,
photographs, and expert testimony, a jury could determine that
Risher had his back turned to Chapman when shots were fired.
Therefore, a jury could find that an officer would not have
reasonably believed he was being threatened of serious physical
harm."); *Williams v. Strickland*, No. 9:15-cv-1118-PMD-MGB, 2017 WL
9286984, at *10 (D.S.C. Jan. 31, 2017), *report and recommendation*
*adopted*, No. 9:15-cv-1118-PMD-MGB, 2017 WL 942176 (D.S.C. Mar. 10,
2017) (internal citations omitted) ("The court cannot reconcile
the [officers'] statements [that Plaintiff was trying to run over
them with his vehicle] with the undisputed medical evidence that
shows that the Plaintiff was shot in the right side of his back

. . . Considering the evidence in the light most favorable to the Plaintiff, the court finds that Strickland is not entitled to summary judgment at this time."); *Jennings v. Charleston Co. Sheriff Dep't*, No. 2:14-cv-00929-RMG, 2015 WL 5009187, at *9 (D.S.C. Aug. 19, 2015) ("[T]he record contains conflicting evidence concerning whether Plaintiff's entry wound was in the back with the exit wound in his right abdomen, or whether the entry wound was the abdomen, with the exit wound in his back.  Even though Plaintiff admits fleeing Poirier . . . , there exist genuine issues of material fact as to the events leading up to the shooting."); *Nolan v. Grim*, No. 5:09-cv-00039-GEC, 2010 WL 4929658, at *9 (W.D.Va. Nov. 30, 2010) ("Because the location of the second bullet wound is consistent with the plaintiff's theory that Nolan was attempting to flee from Deputy Brill at the time of the shooting and, thus, posed no threat to the deputy's safety, such evidence could convince a jury to discredit the deputy's testimony and find that his actions were not objectively reasonable.").

Here, a reasonable jury could credit the officers' testimony and determine that Mr. Ocran pointed his firearm, and perhaps also fired a shot, at Defendant Officers.  On the other hand, a reasonable jury could conclude, based on the evidence that Mr. Ocran was shot in the back while fleeing, that Mr. Ocran never turned around to point a gun at Defendant Officers.  A reasonable

jury could also conclude, based on the facts that no cartridge casings from Mr. Ocran's firearm were recovered on the scene and no officers were shot, that Mr. Ocran never fired a shot.  If Mr. Ocran never pointed or fired his firearm, and merely fled the officers, even while armed, then a jury could conclude that an officer would not have reasonably believed that Mr. Ocran posed an immediate threat to the officer's safety or the safety of anyone else.  Because genuine disputes of material fact remain as to whether Mr. Ocran pointed and fired his firearm, Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment claim.

### b. Qualified Immunity

Defendants assert that even if the court concludes that they may have violated Mr. Ocran's Fourth Amendment rights, they are still entitled to qualified immunity because "there was no clearly established right to point a handgun at law enforcement while fleeing, let alone to discharge the weapon in the Officers' direction."  (ECF No. 44-1, at 23).  Plaintiff responds that Defendants are not entitled to qualified immunity as a matter of law because the right to not be shot as an armed person who is not threatening Defendant Officers or anyone else and not presenting an imminent threat of death or serious harm is clearly established. (ECF No. 51-1, at 8-10).

"[E]xcessive-force claim[s are viewed] through the lens of the affirmative defense of qualified immunity." *Stanton*, 25 F.4th at 233. "Qualified immunity is designed to 'protect[] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines.'" *Aleman*, 80 F.4th at 284 (citing *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005)). "[T]he qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation." *Aleman*, 80 F.4th at 284 (citing *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021)). "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton*, 25 F.4th at 233.

"A right is 'clearly established' when the contours of the right are sufficiently clear to ensure that a 'reasonable official' would have understood that the alleged conduct was unlawful." *Betton*, 942 F.3d at 193 (quoting *Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213, 221 (4th Cir. 2018)). "To determine whether a right is clearly established, [courts] assess whether the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)).

Although "courts are 'not to define clearly established law at a high level of generality,'" *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)), "[t]here is no requirement that the very action in question [must have] previously been held unlawful for a reasonable official to have notice that his conduct violated that right." *Tarashuk v. Givens*, 53 F.4th 154, 164-65 (4th Cir. 2022) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016)). "While [the Supreme Court of the United States's] case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate." *Knibbs*, 30 F.4th at 223-24 (quoting *White v. Pauly*, 580 U.S. 73, 79-80 (2017)), *cert. denied*, 143 S.Ct. 303, 214 L.Ed.2d 133 (2022).

Here, the court has already determined under the first prong that a reasonable jury could conclude that Defendant Officers violated Mr. Ocran's Fourth Amendment rights. The question under the second prong is—under Plaintiff's version of the facts—whether the right not to be shot in the back while fleeing officers when the officers suspected that the individual was armed but the individual never pointed a firearm at the officers was clearly established on January 8, 2021. Although Defendants bear the burden on the second prong of the qualified immunity analysis, they have identified no authorities holding that such a right was not clearly established. (ECF No. 44-1, at 23).

35

The Fourth Circuit has not addressed a case with the exact facts presented here,[7] but it had clearly established the right to be free from deadly force when armed, fleeing, and nonthreatening.[8] *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011).  Thus, the right not to be shot in the back while fleeing officers when the officers suspected that the individual was armed but the individual never pointed a firearm at the officers was clearly established on January 8, 2021.

Even if the right was not clearly established, summary judgment on qualified immunity grounds is improper where a genuine dispute of material fact remains as to whether the officers acted

---

[7] The Fourth Circuit has upheld a district court's decision that officers were entitled to qualified immunity where a plaintiff "proffered no evidence that directly controverts the defendant's deposition testimony and declarations from other non-defendant law enforcement officers that support the defendants' claim that they did not open fire until [the suspect] turned and pointed the alleged pistol in their direction."  *Skeen v. Washington Cnty. Sheriff's Off.*, No. 1:20-cv-00017-JPJ, 2022 WL 1299960, at *6 (W.D.Va. Apr. 22, 2022), *aff'd sub nom. Skeen v. Sparks*, No. 22-1569, 2023 WL 4759122 (4th Cir. July 26, 2023).  Here, however, Plaintiff has proffered evidence that controverts Defendant Officers' testimony that Mr. Ocran pointed his firearm, and there were no witnesses other than Defendant Officers.  Moreover, the *Skeen* opinion was issued after the events giving rise to this case occurred.

[8] The Fourth Circuit had also clearly established the right to be free from deadly force after answering the door holding a firearm.  *Betton*, 942 F.3d at 189, 194; *Cooper*, 735 F.3d at 160; *Pena v. Porter*, 316 F.App'x 303, 307-08, 310-12 (4th Cir. 2009).  Of course, a suspect fleeing the police is different from answering the door to police, but the *Betton* and *Pena* decisions clearly established the right to be free from deadly force even when the officers claimed that the individual *pointed* the weapon at them.

reasonably.   *Risher*, 2019 WL 926414, at *5 (citing *Connor v. Thompson*, 647 F.App'x 231, 239 (4th Cir. 2016) (denying summary judgment on qualified immunity because the facts when viewed in the light most favorable to the Appellee "would be sufficient to support a trier of fact's finding that shooting Carter amounted to excessive force[]" and because "a reasonable officer would know that shooting Carter under the circumstances presented by Appellee's version of the facts would be unlawful[]"); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998) ("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." (quoting *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995)); *Nolan*, 2010 WL 4929658, at *10 (denying summary judgment on qualified immunity where, if plaintiff's version of events is accepted, a reasonable officer in Brill's position could not have believed that he was acting lawfully in employing deadly force[])); *see also Jennings*, 2015 WL 5009187, at *9 (denying defendant's motion for summary judgment on qualified immunity because a material factual dispute remained as to whether the plaintiff took any aggressive posture toward the officer).

Because a jury could conclude that Mr. Ocran never pointed a firearm at Defendant Officers, there is a genuine dispute as to whether Defendant Officers acted reasonably by shooting him in the

back.    Accordingly,  Defendant  Officers  are  not  entitled  to
qualified immunity at this stage of the proceedings.

### 2. State Law Claims

Plaintiff's  remining  claims  against  Defendant  Officers
include wrongful death, survival, and assault and battery, as well
as excessive force and homicide under Article 24 of the Maryland
Declaration  of  Rights,  which  Plaintiff  also  alleges  against  the
City.

### a. Counts Two and Three:  Wrongful Death and Survival Action

Plaintiff  brings  wrongful  death  and  survival  claims  against
Defendant  Officers  under  the  theories  of  negligence,  negligence
per se, and gross negligence.[9]  (ECF No. 1 ¶¶ 70-98).

Maryland's   Wrongful   Death   Act   allows   a   decedent's
beneficiaries or relatives to bring an action "against a person
whose  wrongful  act  causes  the  death  of  another."  Md.  Code  Ann.,
Cts.  &  Jud.  Proc.  §  3-902(a);  *see also Est. of Green v. City of
Annapolis*,  696  F.Supp.3d  130,  174-75  (D.Md.  2023)  (quoting
*Spangler v. McQuitty*, 449 Md. 33, 53 (2016)).  "Wrongful act" is
defined as "an act, neglect, or default including a felonious act
which would have entitled the party injured to maintain an action
and recover damages if death had not ensued."  Md. Code Ann., Cts.

---

[9] The court dismissed the portions of Counts Two and Three
alleging wrongful death and survival action under the theory of
negligent training, supervision, and retention against the City.
(ECF No. 30, at 9-11).

& Jud. Proc. § 3-901(e).  "The wrongful death claim is a separate cause of action."  *Est. of Green*, 696 F.Supp.3d at 175 (citing *Gardner v. Greg's Marine Const., Inc.*, No. 13-cv-1768-DKC, 2014 WL 198215, at *9 (D.Md. Jan. 14, 2014)).

Maryland's survival statute provides:

> (1) A personal representative may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted, except that:
> (i) A personal representative may not institute an action against a defendant for slander against the decedent during the lifetime of the decedent.
> (ii) In an action instituted by the personal representative against a tort-feasor for a wrong which resulted in the death of the decedent, the personal representative may recover the funeral expenses of the decedent up to the amount allowed under § 8-106(c) of this article in addition to other damages recoverable in the action.
> (2) A personal representative may request criminal injuries compensation, restitution, or any other financial property interest for a decedent who was a victim of a crime.

Md. Code Ann., Est. & Trusts § 7-401(y).  "In a survival action, the personal representative of the victim may sue to recover, for the estate of the victim, damages for the economic and non-economic losses suffered by the victim prior to his or her death—the damages that the victim would have been able to recover had he or she survived."  *Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F.Supp.3d 645, 670 (D.Md. 2021) (citing *Smith v. Borello*, 370 Md.

227, 233 (2002)).  "Thus, the wrongful death statute confers a right of action to a decedent's beneficiaries, whereas a survival action is brought by a decedent's personal representatives."  *Id.* (citing *Spangler*, 449 Md. at 55-57).  Maryland's survival statute "does not require that the Complaint expressly allege reliance on the survival statute, nor does it require a separate claim or count bringing a 'survival action.'"  *Est. of Jones v. Maryland Dep't of Pub. Safety*, No. 1:21-cv-01889-JRR, 2024 WL 493269, at *4 (D.Md. Feb. 8, 2024) (quoting *Johnson v. Baltimore Police Dep't*, No. 18-cv-2375-SAG, 2021 WL 1610152, at *5 (D.Md. Apr. 23, 2021)).  In fact, "a separate 'survival' claim is improper, because the survival statute creates no independent cause of action."  *Id.* (citing *Minor v. Prince George's Cnty., Maryland*, No. 15-cv-983-PWG, 2017 WL 633321, at *1 (D.Md. Feb. 15, 2017); *Gardner*, 2014 WL 198215, at *9).

Because a survival action is not an independent cause of action, Defendants' motion for summary judgment will be granted as to the title of Count Three, which alleges a survival action.  The contents of Count Three, however, allege negligence, negligence per se, and gross negligence.  (ECF No. 1 ¶¶ 84-98).  Specifically, Count Three alleges that Defendant Officers (1) owed Mr. Ocran the duties "not to create an unsafe condition for Mr. Ocran and others in their efforts to effect the arrest of Mr. Ocran while possessing a firearm[,]" "not to draw or point their firearms in the direction

40

of Mr. Ocran[,]" and "not to discharge their firearms in the
direction of Mr. Ocran[;]" (2) Defendant Officers breached those
duties by "draw[ing] their firearms and point[ing] them in the
direction of Mr. Ocran[]" and by "discharge[ing] their firearms
and point[ing] them in the direction of Mr. Ocran[;]" (3)
"Defendant Officers committed negligence per se by violating
Maryland Law[;]" (4) "Defendant Officers, in pointing their
firearms and shooting at Mr. Ocran, acted with evil motive, actual
malice, deliberated violence or oppression, or with intent to
injure, or in willful disregard for Mr. Ocran's rights and their
conduct was outrageous, grossly fraudulent, or reckless toward Mr.
Ocran's safety[;]" (5) "[a]s a direct and proximate result of
Defendants' wrongful acts, each breach of each standard of ordinary
care, and/or negligence, Plaintiff asserts that she has incurred
all damages cognizable under the Survival Act Statute including
but not limited to, loss of financial support, loss of services,
loss of society, loss of companionship, loss of comfort, loss of
attention, loss of advice, loss of counsel, loss of economic
damages and funeral expenses[;]" and (6) "Mr. Ocran's injuries,
damages, losses and death were directly and proximately caused by
the negligence and breaches of applicable duties by Defendants
with no negligence on the part of Mr. Ocran himself or his Estate
contributing thereto." (ECF No. 1 ¶¶ 86-88, 90, 96-97).

Defendants' motion will be granted as to the portions of Count Three alleging negligence and negligence per se.  First, Defendant Officers are immune from liability for simple negligence.  Under the Maryland Tort Claims Act, "[a]n official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."  Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1).  "Law enforcement officers are public officials for the purposes of public official immunity." *McGowan v. Prince George's Cnty., Maryland*, 401 F.Supp.3d 564, 571 (D.Md. 2019) (citing *Cooper v. Rodriguez*, 443 Md. 680, 727 (2015)).  It is undisputed that Defendant Officers were acting in a discretionary capacity in the scope of employment.  (ECF Nos. 1 ¶¶ 17, 73, 74; 44-1, at 25-26).  Thus, they are entitled to public official immunity if they acted only negligently.  *See McGowan*, 401 F.Supp.3d at 571 ("The public official immunity police officers enjoy in accordance with the doctrine [of public official immunity] frees them from suit for their alleged negligent acts."); *cf. Krell v. Braightmeyer*, 828 F.App'x 155, 169-60 (4th Cir. 2020) (holding that officers are entitled to immunity under the Maryland Tort Claims Act on the simple negligence count but not the gross negligence count, even where the "negligence claim rose and fell with the gross negligence claim," because "these two torts are, in

fact, mutually exclusive of one another"). Second, because Plaintiff does not specify which statute Defendant Officers allegedly violated, (ECF No. 1 ¶ 75), she has not properly alleged negligence per se. *See Absolon v. Dollahite*, 376 Md. 547, 557 (2003) ("[T]he settled rule in Maryland is that a statutory violation is evidence of negligence. It does not constitute negligence *per se*, unless a statute expressly makes it so.").

Defendants' motion for summary judgment, however, will be denied as to the portion of Count Three alleging gross negligence. "[T]here is no immunity for any alleged intentional torts or any alleged acts committed with actual malice or which were grossly negligent." *Est. of LeRoux v. Montgomery Cnty., Maryland*, No. 8:22-cv-00856-AAQ, 2023 WL 2571518, at *20 (D.Md. Mar. 20, 2023) (citing *McGowan*, 401 F.Supp.3d at 571); *see also Pelt v. United States Dep't of Homeland Sec.*, No. 8:22-cv-00429-PX, 2023 WL 3453786, at *3 (D.Md. May 15, 2023) (citing *Cooper*, 443 Md. at 714, 723) ("[P]ublic official immunity does not reach acts committed with gross negligence or malice.").

In Maryland, "gross negligence is 'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Cooper*, 443 Md. at 708 (quoting *Barbre v. Pope*, 402 Md. 157, 187 (2007)). "'Whether or not gross

negligence exists necessarily depends on the facts and circumstances in each case[,]' and 'is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached.'" *Id.* at 708-09 (quoting *Romanesk v. Rose*, 248 Md. 420, 423 (1968)). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Id.* at 709 (quoting *Taylor v. Harford Cnty. Dep't of Social Servs.*, 384 Md. 213, 229 (2004)).

"Malice means 'conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will; or fraud,' and a plaintiff asserting malice[] 'must point to specific evidence that raises an inference that the defendant's actions were improperly motivated.'" *White v. City of Annapolis by & through City Council*, 439 F.Supp.3d 522, 536 (D.Md. 2020) (quoting *Koon as next friend of Glay v. Prince George's Cnty.*, No. 17-cv-2799-DKC, 2019 WL 1317401, at *7 (D.Md. March 22, 2019)). "Unjustified application of malignant force may give rise to a reasonable inference that [an officer] was motivated by ill will toward or an affirmative intent to injure Plaintiff." *Est. of LeRoux*, 2023 WL 2571518, at *20 (quoting *Solis v. Prince George's Cnty.*, 153 F.Supp.2d 793, 805 (D.Md. 2001)).

44

Here, if the jury concludes that Mr. Ocran never pointed or fired a firearm at Defendant Officers, then it could find that Defendant Officers acted with gross negligence or malice when they shot him in the back over twenty times as he fled.  Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1).

As in her survival claim, Plaintiff premises her wrongful death claim on Defendant Officers' alleged negligence, negligence per se, and gross negligence.  (ECF No. 1 ¶¶ 70-83).  Unlike a survival action, a wrongful death claim is a separate cause of action.  *Est. of Green*, 696 F.Supp.3d at 175 (citing *Gardner*, 2014 WL 198215, at *9).  It is undisputed that Plaintiff is eligible to bring suit under Maryland's wrongful death statute as she is Mr. Ocran's parent.  Md. Code Ann., Cts. & Jud. Proc. § 3-904.  Because a jury could conclude that Mr. Ocran did not point or shoot a firearm at Defendant Officers, a jury could find that Defendant Officers committed a "wrongful act" by shooting him in the back while he fled.  Md. Code Ann., Cts. & Jud. Proc. § 3-901(e), 902(a).  For the same reasons as discussed regarding Count Three, Defendants' motion for summary judgment will be granted as to the portion of Count Two alleging negligence and negligence per se and denied as to the portion alleging gross negligence.

### b. Count Four:  Assault and Battery

Plaintiff alleges that Defendant Officers engaged in assault and battery by shooting Mr. Ocran several times, thereby causing

his death.  (ECF No. 1 ¶¶ 99-104).  "The parallel state law claim of assault and battery is subsumed within the federal excessive force claim[.]"  *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); *see also Cooper*, 735 F.3d at 160.  Because the court has concluded that the evidence, when viewed in the light most favorable to Plaintiff, would support Plaintiff's excessive force claim, the claim for assault and battery "goes forward as well." *Rowland*, 41 F.3d at 174.  Thus, Defendants' motion for summary judgment will be denied as to Count Four.

### c. Count Six:   Article 24 of the Maryland Declaration of Rights

Plaintiff alleges that Defendant Officers violated Article 24 of the Maryland Declaration of Rights by depriving him of liberty and property and using excessive force that caused his death.  (ECF No. 1 ¶¶ 108-121).  She alleges that the City is vicariously liable for Defendant Officers' violations of the Maryland Declaration of Rights.  (*Id.* ¶ 119).

Article 24 of the Maryland Declaration of Rights is construed *in pari materia* with the Due Process Clause of the Fourteenth Amendment.  *Est. of Green*, 696 F.Supp.3d at 160 (citing *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 185 Md.App. 625, 636 (2009)). Although Plaintiff did not bring her Maryland constitutional claim under Article 26, which is construed *in pari materia* with the Fourth Amendment, a "claim of excessive force brought under Article

46

24 is analyzed in the same manner as if the claim were brought under Article 26." *Randall v. Peaco*, 175 Md.App. 320, 330 (2007) (citing *Okwa v. Harper*, 360 Md. 161, 203-04 (2000); *Williams v. Prince George's Cnty.*, 112 Md.App. 526, 547 (1996)).   "In both instances, the claim is assessed under Fourth Amendment jurisprudence, rather than notions of substantive due process, precisely like the analysis employed for claims brought under 42 U.S.C. § 1983." *Id.* (citing *Graham*, 490 U.S. at 388; *Richardson v. McGriff*, 361 Md. 437, 452 (2000); *Okwa*, 360 Md. at 240); *see also Wilson*, 893 F.3d at 224 (citing *Henry*, 652 F.3d at 536) ("The same standard applies to the Maryland Declaration of Rights claims as to claims asserted under the Fourth Amendment."); *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 631 n.5 (4th Cir. 2007) (citing *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77-78 (2001)) ("Plaintiff's state constitutional claims under Articles 24 and 26 of the Maryland Declaration of Rights are construed *in pari materia* to his Fourth Amendment claim.").

Because Defendants have not established that Defendant Officers did not use excessive force in violation of the Fourth Amendment, they have also failed to establish that they are entitled to summary judgment under the claim alleging a violation of the Maryland Declaration of Rights. *Wilson*, 893 F.3d at 224-25.   Accordingly, Defendant Officers are not entitled to summary

judgment on the portion of Count Six alleging that they violated the Maryland Declaration of Rights.

Nor is the City entitled to summary judgment on the portion of Count Six alleging that it is vicariously liable for Defendant Officers' alleged violations of the Maryland Declaration of Rights. "Unlike in a § 1983 action and unlike in an action for some common law torts, neither the local government official nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution." *DiPino v. Davis*, 354 Md. 18, 51 (1999). "[L]ocal governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *Id.*

Where genuine disputes of material fact remain as to whether an officer violated a plaintiff's constitutional rights, courts decline to grant summary judgment to the local governmental entity on a *respondeat superior* claim alleging a violation of the Maryland Declaration of Rights. *See, e.g.*, *Key v. Montgomery Cnty. Maryland*, No. 21-cv-2021-MJM, 2023 WL 6308044, at *9 (D.Md. Sept. 28, 2023) (denying summary judgment to the County because "Plaintiff may prevail against Butterworth and Montgomery County on his Article 24 claim by demonstrating that the alleged constitutional violation, excessive force, was undertaken by

48

Butterworth within the scope of his employment with Montgomery County[]"); *Palmont v. Wright*, No. 19-cv-0568-PWG, 2020 WL 7043850, at *7 (D.Md. Dec. 1, 2020) (denying summary judgment to the County because "[u]nder *respondeat superior*, if Cpl. Wright committed a violation of Mr. Palmont's rights under the Maryland Constitution, Montgomery County may be held liable for Cpl. Wright's conduct[]"); *Solis*, 153 F.Supp.2d at 806 (denying summary judgment to the County because "genuine issues of material fact exist as to whether Officer Ruffin violated the constitutional protections afforded Mr. Solis under Maryland's Declaration of Rights[]" and "[t]here is no dispute that Officer Ruffin committed that acts within the scope of his employment[]").

Here, as discussed, genuine disputes of material fact remain as to whether Mr. Ocran pointed or fired a firearm at Defendant Officers. It is undisputed that Defendant Officers acted in the scope of employment at all relevant times. Hence, Defendants' motion for summary judgment will be denied as to both portions of Count Six: the portion alleging that Defendant Officers are directly liable for violating the Maryland Declaration of Rights and the portion alleging that the City is vicariously liable for Defendant Officers' alleged violations.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted as to the portions of Counts Two and Three

alleging negligence and negligence per se and denied as to all other counts, Defendants' motion for leave to file video recordings as exhibits will be granted, and Plaintiff's motion for leave to file an audio recording as an exhibit will be granted.  A separate order will follow.

                                                          /s/
                                            DEBORAH K. CHASANOW
                                            United States District Judge